Good afternoon, your honors. My name is Jennifer Anderson and I represent the petitioner Sandra Bahr, Jeannie Lunn, and David Matizow. I'd like to reserve five minutes of my time for rebuttal if possible. The Phoenix metropolitan area has a long history of failing to meet national ambient air quality standards for putting residents of this area at risk for ailments, hospitalizations, and even premature death. In its November 12, 2019 rulemaking, EPA determined that as of the end of the 2017 ozone season, the Phoenix area had attained the ozone standard set in 2008 of 75 parts per billion. However, this attainment was short-lived and only occurred after EPA excluded from its calculation multiple exceedances that occurred June 20, 2015 as exceptional events caused by a wall in Southern California. EPA also decided to exempt the state of Arizona from having to adopt contingency or backup control measures in its 2008 ozone implementation plan. Petitioners challenged both of these decisions. In my remarks today, I'd like to focus on the main points. EPA acted unlawfully in exempting the state from having to adopt contingency measures as required by 42 U.S.C. Section 752C9, particularly when Phoenix has continued to be, leaving Phoenix, in paper attainment, actual, additional, You're cutting in and out, Ms. Anderson. Okay. Kalani, is there anything we can do to fix the situation, or? Why don't we start the timer again? Yeah, sorry. Kwame, are you there? I would be if I was unmuted. Yes. What was working the best before was just using your iPhone, the handheld phone for your audio. What happened when you turned on before is you had both going. Would it be possible for you to call back using that iPhone and then just turn off the audio completely on your Zoom system? Okay, sorry. I thought I did that, but I guess I didn't do it correctly. Yeah, we did a lot of things before recording. Okay, all right. I'm muting off the audio. Okay, so yes, just call back using your, yeah, using that handheld phone. Okay. Okay. Okay. Can you hear me? Yes, we've got you there. Can you give me just another sentence just to make sure we don't have any more issues? Yes, I would like to address three main points today. Okay, we're hearing you great. Judge Wilmette, I'm unmuting the public audio stream. Okay. Okay, great. First, EPA acted unlawfully in exempting the state from having to adopt valid contingency measures, particularly when Phoenix has continued to record exceedances of the 2008 ozone standard, leaving Phoenix residents in a limbo between a paper attainment and an actual non-attainment of the ozone standard with no additional control measures to bring them back into attainment. Second, the claimed June 20, 2015 exceptional events should be evaluated under the 2007 version of the exceptional events rule, which the state failed to meet as a matter of law. Third, even assuming the 2016 version of the exceptional events rule applies, the EPA acted arbitrarily and capriciously by relying on carbon and nitrogen dioxide data from non-exceeding monitors that are neither co-located nor nearby the exceeding monitors in order to find a clear causal relationship between lake fire emissions and the June 20, 2015 exceedances. Turning to my first point, 42 U.S.C. 7502C9 requires that non-attainment SIPS data implementation plans shall provide for the implementation of specific measures to be or to attain the national primary ambient air quality standard by the applicable attainment date under this part. Such measures known as contingency measures must be designed to take effect without further action by the state or by the EPA administrator. Here, EPA exempted the state from having to include contingency measures in its 2008 ozone SIPS revision because EPA knew the contingency measures contained in that plan were invalid under this court's 2016 opinion in Barr v. EPA. Barr held that section 7502C9 contingency measures refers to control measures that will be implemented in the future, not measures that have already been implemented or are scheduled for implementation. The 2008 ozone SIPS revision for Phoenix relied on so-called surplus emission reduction from control measures already in place for its contingency measures, and those measures were therefore invalid. Ms. Anderson, may I ask you a question as to your first point? Yes. Where in the public comment memo did Barr claim the EPA should not have used the 2016 standards but should have used the 2007 standards? Well, Barr did not say that expressly. However, her comment brought... And therefore, why haven't you waived the point? We didn't waive the point because under this court's jurisdiction on administrative exhaustion, if a court or if an agency actually addresses the issue, then the policies underlying exhaustion are satisfied. And I would cite you specifically to SSA terminals versus carry-on. That's 821F3-1168. Another case... Sorry. Where did the agency deal with not using the 2007 standards and using the 2016 standards as a contested issue? It addressed that in its final rulemaking, and I can find that for you. All the agency said was that they were using the 2016 rule. But doesn't that beg the question that there's something else that... Not beg the question. Put the question. Doesn't that put the question that there's another rule that could alternatively have been used? And so I think that that put the agency on notice that there was another rule that could potentially apply, and the agency chose to apply the 2016 rule. So you admit that at no point in the public comment did Ms. Barr or did the appellant raise specifically that the 2007 rule should have been applied rather than the 2016 rule? No, I don't admit that because her comments, while they did not say as much, her comments reflected the elements of the 2007 rule in two respects. Number one, the 2007 rule requires that the... A comparison to... Requires that the exceedance days be no higher than historical fluctuations. So Ms. Barr, in her comments, she had a chart of historical fluctuations and that's on page 39 of the excerpts of record, where she shows that the exceedance days monitor levels that are around the same level, if not lower, than other exceedance days during that ozone season. So, you know, Ms. Barr is not a lawyer. She's not required to state things in legal terms. However, she did invoke that element of the 2007 rule by making that comparison and showing that the exceedance days were not out of line with historical fluctuations. The second way was that she... She did not use those exact words in excess of normal historical fluctuations. She did... I don't recall whether she used those exact words, but I don't think she needs to. It's pretty clear under National Parks and Conservation Association versus Bureau of Land Management 606 F. 3rd. 1058 that petitioners need not state their claims in precise legal terms and need only raise an issue with sufficient clarity to allow the decision maker to understand and rule on the issue raised. The other manner in which she invoked the 2007 rule was by critiquing the regression analysis that the Arizona Department of Environmental Quality... I'm sorry. That chart was in the opening brief. Let me find it. Let me find the excerpts of record page. All right. I can find it. One second. Ms. Anderson, let's... For the purposes of this argument, which we don't have much time on, let's... Okay. Suppose you haven't waived that point. What is wrong with applying the 20... rather than the 2007 ruling for its 2019 decision? What's wrong with that? I'm sorry, Your Honor. Would you repeat the question? How do you apply the 2016 standard retroactively? Well, it's pretty clear under this court's precedent that you don't apply rules retroactively. Just the opposite. You have to show that you hadn't gotten fair notice that they were going to be approved. You've got to show there was reasonable reliance on the prior standard, and you've got to show some subtle expectations under INS versus St. Cyr that have been violated. Well, I think there... I think that you do have subtle expectations. If you look at the process for identifying and proving an exceptional event, the agency... What subtle expectations did you have in the 2007 rule which were not also incorporated in the 2016 rule? Well, just talking in general, the regulation, which is 40 CFR, I think it's 50.14, talks about how the agency needs to flag the data in the air quality system and alert the public, and then begin preparing a fuller demonstration of the causal relationship between the event and the exceedance. I think at that time, I mean, there's an assumption that the rule in effect at that time is going to apply. Certainly, if EPA had strengthened the exceptional events rule after the June 2015 exceedances, and then said, ADEQ, you need to meet the stronger standard, the agency would have protested vigorously, and rightly so, because, I mean, they're putting a lot of effort and time into this analysis. It's a bright line, clear rule that the rule in effect at the time of the exceedance is the one that it's evaluated under. I think that that just makes sense. Is that all you've got to say on that? I guess so. Let's move on to the next point, okay? All right. Before we move on, can I just want to ask one procedural question? Once the EPA put out the final rule where it noted that it was applying the 2016 rules, could Ms. Barr contest that, or is that the end of it? I think she is challenging the application of the 2016 rule. No, no. I'm saying once the EPA announced that it was using the 2016 rule in its final rule, is there a mechanism for Ms. Barr to challenge, contest the use of the 2016 versus 2007 rule, or has the comment period just ended and there's nothing further she could have done? There's nothing further she could have done other than filing a petition for review, which is what she did. I see. So, turning back to contingency measures, and then I'll talk about the 2016 rule. EPA claims it can exempt control measures because the Phoenix ozone nonattainment reached brief attainment of the 2008 ozone standard by July 20, 2018, and there is accordingly no longer a need for contingency measures. But it is undisputed that in 2018, 2019, and 2020, air quality monitors in the Phoenix area recorded numerous exceedances, some of them quite extreme, of the 2008 ozone standard. Petitioners believe that the plain language of the Act is clear. Nonattainment plan revisions must include contingency measures. But to the extent the language is ambiguous with respect to areas that reach attainment of the standard, EPA has resolved that ambiguity in its clean data policy and rules. EPA established its clean data policy following the 1990 amendments to the Act and memorialized it in the site's memorandum. Under the site's memorandum, requirements to submit SIP revisions addressing reasonable further progress and attainment demonstrations and related requirements, such as contingency measures, can be suspended for areas demonstrating attainment of the ozone max for three years, but only for as long as the area continues to meet the standard. EPA reasoned these planning requirements no longer have meaning for such areas because they are designed to help nonattainment areas reach attainment. However, EPA emphasized that if such an area were to monitor a violation of the NAAQS, the basis for excusing the requirements would no longer exist and the areas would have to submit a SIP revision to address them. The memo explained that an attainment determination amounts to, quote, no more than a suspension of the requirement for so long as the area continues to attain the standard. An area can only be... Daily monitorings of standard as to whether the SIP should have contingency measures? I'm sorry. What was that again? As I understand what you're saying, is that notwithstanding attainment by a certain date, your reading of the legislation is that they have to keep putting out daily findings as to whether they're still in attainment or not. Is that correct? Well, they do continue to monitor. They do continue to... I'm sorry. If they don't have attainment following the attainment date, they have to put in contingency measures in their SIP, right? That's correct. And you don't need to take my word for it that EPA, that Phoenix is in nonattainment for the 2008 ozone standard. On EPA's own website, they've calculated the design value for the Phoenix area as being 77 parts per billion. And the design value is the statistic that EPA uses to compare to the NACs to see whether an area is meeting it. And that design value is based on three years of quality-controlled data. It's not like something that bounces up and down, bounces up and down. Once they have three years of quality-controlled data, they arrive at the design value. The current design value for the past three years of complete quality-controlled data is 77 parts per billion, two parts per billion over the standard. So you're almost at two minutes. I know you wanted to reserve some time for rebuttal. Do you want to do that? Sure, I can do that. Thank you, Your Honor. Mr. Hudson? Good afternoon, Your Honor. May it please the Court. My name is Andrew P. Hudson representing the respondents, United States Environmental Protection Agency, in this matter. The petitioners ask this Court to second-guess EPA's determination that Arizona demonstrated a clear causal relationship between the lake fire emissions and the exceedances on June 20, 2015. Mr. Newsom, I would advise you to go a bit slower in your speech. Thank you, Your Honor. EPA's decision is supported by the weight of the evidence in the record, and its determinations under the exceptional events rule are entitled to The petitioners also challenge EPA's findings that because the Phoenix area met the NAACP by its attainment date, it was no longer required to submit contingency measures that could only be triggered by a failure to attain by that date. Petitioners have waived their arguments by failing to raise them in comments, but even setting waiver issues aside, EPA's action is consistent with the agency precedent and reflects a reasonable interpretation of the Clean Air Act. Addressing first the exceptional events demonstration issues, EPA properly concurred in Arizona's exceptional events demonstration for the June 2015 exceedances. Based on the weight of the evidence in the record, EPA reasonably found that Arizona established a clear causal relationship between the exceedances and the lake fire. Here, EPA held Arizona to its most rigorous Tier 3 demonstration, requiring the highest level of evidentiary support. Arizona needed to provide documentation showing EPA that the emissions traveled to the monitors, affected those monitors, and caused the exceedances. After considering the weight of all the evidence, EPA found Arizona carried the burden on all three. EPA didn't reach this conclusion lightly. It conducted a rigorous analysis of all the documentation Arizona supported. It considered public comments, including those of the petitioners, and it requirements and the 2016 wildfire guidance. It twice required Arizona to supplement its initial submittal with additional information addressing various uncertainties or other deficiencies in its first submission. The petitioners here haven't shown that EPA's conclusion was arbitrary or capricious. This isn't a case where EPA has considered some improper factor or overlooked some important issue that the petitioners flagged for them. It's simply a case where the petitioners have a difference of opinion about how the evidence was reported. That kind of disagreement isn't enough to conclude that the agency acted irrationally. And this court has repeatedly held in cases involving the exceptional events rule that EPA's scientific judgments and technical analyses are entitled to significant deference. EPA considered each of the petitioners' objections and explained why they didn't alter EPA's conclusion about the weight of the evidence. And because EPA's responses to these comments were reasonable and based on the I'll address, too, the petitioners' arguments regarding the 2007 exceptional events rule and the requirements, the two specific requirements of that rule. Petitioners have waived these arguments by failing to raise them in their comments. And I want to respond to a few of the points that council petitioners made. First of all, the comments in the petitioner bar submitted simply don't go to this issue. The specific comments that opposing counsel referred to were really aimed towards whether Arizona had satisfied the clear causal relationship criteria. I think the best evidence for that reading of their comments is the fact that petitioners used those same arguments word for word in their opening brief to argue the clear causal relationship issue. To the extent that it's even possible to read those as going to the 2007 criteria, it's at least not sufficiently clear to put the agency on notice. Second, the petitioners have argued here that EPA considered this issue and addressed it. But what they have pointed to in the final rule is not any kind of – it doesn't indicate that EPA was aware that petitioners thought the 2007 rule applied in this case. It's simply EPA recognizing that the petitioners seemed to misunderstand the requirements of the 2016 rule and clarifying what those were. Well, Counselor, just to push back on that, if she raised an issue that's only part of an element of the 2007 rule, why is that not notice enough to EPA that Ms. Barr thought the 2007 rule applied? Well, Your Honor, the petitioners didn't raise any issues that were specific to the 2007 rule. I think petitioners referred to what they claimed was referring to the requirement to show exceedances beyond historical fluctuation. And the petitioners didn't use that particular language in the comments. They've argued that they're not required to use any kind of precise legal formulation. But in looking at – again, looking at those comments, there's no indication that that's what they were commenting on. The issues they were raising were also relevant to the clear causal relationship requirement and whether – particularly how unusual these exceedances were from normal concentrations. They've also pointed to, I think, the Arizona submission of a regression analysis that supposedly was for use in the Buff-4 criterion in the 2007 rule. But looking at Arizona's submission, it's actually clear that that's not what Arizona was aiming that for, or at least not the sole purpose of submitting that In fact, on page three of the initial submission from Arizona, which is, I think, page 338 of the excerpts of records, Arizona made clear that it was submitting that for the dual purposes of addressing the Buff-4 criterion or the clear causal relationship criterion. And this kind of – this looks ahead to a further point about the retroactivity issue, which is about whether Arizona's expectations were disrupted somehow. So if we were even to assume that the petitioners hadn't waived this issue, there's a question of whether it would be impermissibly retroactive to apply the 2016 rule in this case. And I think it's clear from Arizona's submittals that Arizona wasn't relying on the 2007 rule in its own submissions. On page one of its initial submittal, Arizona stated – it acknowledged that EPA was in the process of revising the requirements of the exceptional events rule, and they stated that its documentation in its submittal is structured in such a way as to meet both the existing requirements in 40 CFR 50.14 and the proposed revisions to that provision that EPA plans to finalize. So there was no expectations that were unsettled by application of this rule. If I may, I'll move on to the contingency measures issue. EPA lawfully found that because the Phoenix area had attained the 2008 ozone max by the attainment date, that the requirement for attainment contingency measures would no longer apply. As an initial matter, again here by failing to raise this issue in their comments, the petitioners have waived any argument that the attainment contingency measures requirement should continue to apply to the Arizona city. EPA's proposal, like its final rule, made the agency's position clear that if it met the 7511B2 determination, that the attainment contingency measures requirement would no longer apply. EPA was also clear in its proposal that its rationale was that because after issuance of this determination, the contingency measures could no longer be triggered, regardless of whether the area continued to attain or not past that attainment date. And EPA was clear that under its proposed action, the requirement would not spring back if the area monitored exceedances after the attainment date. And finally, it was explicit that it was not acting on a clean data policy and was not issuing a clean data determination. The petitioners didn't comment on any of these aspects of the proposed rule. And their only passing reference in these comments was to state that they opposed the contingency measure proposal for the reasons discussed above in their comments. But the most natural reading of that comment, if not the only reasonable reading, is them arguing that the contingency measures requirement should continue to apply based on their objection to EPA's issuance of the 7511B2 determination. So in other words, all of the reasons discussed above in those comments went to their concerns about why EPA should not finalize its finding that Phoenix had attained by the attainment date. The petitioners never objected to EPA's stated legal rationale in the proposal that if it did finalize that determination, the attainment contingency measures requirement would no longer apply. But even if this court were to reach the merits of this issue and absolve the petitioners of any waiver, EPA's decision should be upheld because it reflects a reasonable interpretation of the act and because it's consistent with EPA's past practice. I want to clarify first that there are a few things that are clear from the statute that are not ambiguous. The text of 7502C9 is clear that attainment contingency measures can only be assessed by the attainment date. The text of section 7511B2 is equally clear that whether an area attained by the attainment date must be assessed based on its design value as of that date. As a result of those two provisions being read together, the Clean Air Act clearly provides that once EPA makes a finding of attainment by the attainment date for an area, then the attainment contingency measures simply could never be triggered regardless of whether it happens to monitor non-attainment after the attainment date. Where the Clean Air Act is ambiguous, and this goes to the interpretive question at issue here, is a subsidiary question, which is whether the state is required to include attainment contingency measures in its SIPs amendment after the point at which those contingency measures could no longer be triggered. Neither of these statutory provisions directly answers that question. And in light of the ambiguity that's left by that gap, EPA has interpreted the act to not require those contingency measures to be included in a state SIP after the issuance of the 7511B2. Let me ask you a question. Is it your position once attainment is arrived at, then there is no necessity to have a reasonable forward progress finding to trigger contingency measures? Your Honor, this particular case only involves the attainment contingency measures for the Phoenix area. As I understood it, the appellants were arguing that notwithstanding the contingency measures which obtained prior to the attainment date finding, you should keep doing reasonable forward progress findings to trigger contingency measures after that date. Your Honor, I think you're referring to further 7511B2 determinations, which are an assessment of whether the area has attained by the attainment date. Is that correct? Right. Right. So, no, the text of the statute is clear that that specific determination under 7511B2 has to be made based on the design value as of that attainment date, a specific point in time. In Section 7502C9, it's clear that contingency measures are only triggered by a failure to attain by that date. And so, therefore, to have reasonable forward progress does not trigger contingency measures? Well, I think the—I'm hesitating to use reasonable further progress because that's a specific term of art that applies to other nonattainment requirements under the Clean Air Act. But an area certainly has an obligation to continue attaining the NAAQS. And EPA—so an area is not absolved of the obligation to attain the NAAQS after the point at which its attainment date falls. The question here is really only about one specific piece of the nonattainment requirements for an area, which is these attainment contingency measures. And that requirement, by its own statutory text, is tied to this one specific moment in time. So your position is that there need not be any further contingency measures provided for as a result of whatever is found on the reasonable future progress? Our EPA's position is that the only event that can trigger the attainment that are at issue in this case is a failure to attain by the attainment date. So it looks to the design value on that date, which here was in July of 2017. So do I have it right? So if a state or the area reaches attainment by the attainment date, then the obligation to follow the plan under 7502C9 ends. Is that EPA's position? So EPA's position is that after the point at which an area has attained by its attainment date, when EPA has issued that specific finding under 7511B2, then the state is no longer required to submit a SIP that includes those attainment contingency measures. But they're no longer required to submit, but what about if they already submitted it? Are they required to keep on complying with the contingencies in the SIP? Well, those contingency measures would be a part of the SIP, but they would never be triggered. A contingency measure is a provision which is implemented without any further action by EPA or the state upon a finding of failure to attain by the attainment date. So, you know, the requirement would theoretically stay a part of the SIP. It's just the contingency measures themselves would simply never be sprung into action. I'm just reading 7502C9. It says, such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress. So, are you saying that that ends if they reach an attainment date, attainment by the attainment date? So that is a separate set of contingency measures. EPA has interpreted 7502C9 to refer to two different types of contingency measures. There are attainment contingency measures, which are those at issue here, and reasonable further progress contingency measures, which are at issue in another case that's pending before this court and still being briefed. So there's a different regime that would apply to EPA's interpretation of when RFP contingency measures are triggered and when the requirement may become applicable, depending on an area's attainment status. How do those contingency measures differ from the contingency measures that we're talking about here before the attainment date? So the reasonable further progress contingency measures, the timing in which those could be triggered depends on the non-attainment classification status of various areas. So for a moderate area, such as the Phoenix area, EPA has interpreted the trigger date for those to be the same, to be the attainment date specified for the area. But for other classifications, there are different trigger points for RFP contingency measures that I'm not as familiar with because they're not at issue in this case. All that said, Your Honor, the ambiguity here that EPA addressed is whether the state is required to include attainment contingency measures in its SIP once they can no longer be triggered. And EPA's interpretation here is a reasonable one.    requiring a state to include measures in its SIP that, by definition, could never be implemented. It's also consistent with case law that has interpreted the applicability of other 172C non-attainment or attainment-related SIP requirements in other circumstances where the conditions they're linked to have been rendered null by circumstances in the area. So for example, the Seventh Circuit in Sierra Club v. EPA upheld EPA's position in its general preamble, which dates to around the time of the 1990 Clean Air Act amendments, which says that for purposes of redesignation, certain attainment- related SIP requirements are no longer applicable SIP requirements because once the area is attaining, those area requirements would no longer serve a purpose. This is not a departure from past precedent for EPA. In fact, what the action EPA took in this rule here is consistent with EPA's practice in issuing previous 7511B2 determinations. Since at least 2005, EPA has taken the position that once it finds an area attained by the attainment date, then that area is no longer subject to the contingency measures requirements because they couldn't be triggered. That was the case in a 2005 action for the Las Vegas area and in a 2009 action for the Ventura County, California non-attainment area. Each of the examples that petitioners have cited here all involves EPA actions under the Clean Data Policy, which are legally distinct and not analogous to the type of 7511B2 determination here. Finally, I want to address the petitioner's claim that EPA's interpretation somehow leaves Arizona in a non-attainment limbo or otherwise deprives the state or EPA of ways to continue furthering attainment of the NACs. Again, this isn't an issue that's directly implicated by the statutory interpretation at issue here because, again, under the clear language of the statute, these contingency measures could not be triggered after finding of attainment by the attainment date. So EPA's action here didn't deprive Arizona of the benefit of some emission reductions that might otherwise be triggered because, again, the finding of stepping back from a practical standpoint, this doesn't consign the area to some kind of perpetual non-attainment because there are lots of tools left in EPA's and the state's quiver that allow them both to continue advancing attainment of the NACs. As I mentioned before, there are a host of other non-attainment SIP requirements that continue to apply because EPA did not make a clean data determination in this area. And also, EPA has discretionary authority to issue what's known as a SIP call under Section 7410K5 where it finds that an area SIP is substantially inadequate to attain or maintain the NACs. When those criteria are met, EPA can require Arizona to submit new attainment related provisions to address continuing attainment problems. So for all these reasons, the Courtshield Poll EPA's action denied the petition for review. Thank you. Thank you, Counsel. Ms. Anderson?  Thank you, Your Honor. Just a couple points. As far as waiver of the 2007 version of the Exceptional Events Rule, I would direct the Court to page 3 of the Records of Records, the third column over. I'm not going to belabor it because I don't have much time, but I think it's an argument by Ms. Barr that the exceedances were not, you know, out of the ordinary from what other concentrations had been recorded that same year. And EPA was put on notice that EPA said a previous version of the Exceptional Events Rule required that in addition to meeting these statutory elements and criteria, states also submit evidence the event was associated with a measured concentration in excess of normal historical fluctuations, blah, blah, blah. But then it applied the 2016 rule. I think it decided the issue there. It was on notice of the issue, and that claim was not waived. As far as making the same argument about clear causal relationship in the element of both the 2007 rule and the 2016 rule, so that says nothing about waiver. As far as waiver of contingency measures, Petitioner Barr said in her letter that for the reasons discussed above, the EPA should not waive contingency measures. Those reasons included numerous violations of the standard after the attainment date. This idea that a clean data determination is somehow functionally different than an attainment, a clean data determination is different from an attainment determination, there is no functional difference. This is a form over substance argument. In both, the EPA looks at whether there are three years of data and whether they are clean. And in fact, in its wildfire guidance on the record, page 208, EPA acknowledges that they are functionally the same when it said attainment determinations include clean data determinations. It's not a reasonable interpretation of the Act to say that once you hit that attainment date, then contingency measures are never triggered. The D.C. Circuit says that considered as a whole, the Act reflects Congress' intent that air quality should be improved until safe and never allowed to retreat thereafter. Under EPA's reading of the statute, EPA is focusing on the attain, the achievement, but not on the maintaining, not on the keeping it from retreating. The only reason contingency measures can't be triggered is because EPA is unreasonably interpreting the Act that way. The EPA could easily say once, you know, once we've determined the design value of an area, just like with our clean data determination, once we've determined that an area is no longer attaining, we are going to issue a SIP call and require contingency measures. There's just simply no reason why people who are the subject of a clean data determination get contingency measures when their area lapses back into nonattainment, but people whose area attains as of the deadline are not, don't get the same benefit. And unfortunately, the control measures in the current SIP are not enough. Otherwise, we wouldn't be here three years later continuing to violate the Ozone Act. And for that, for those reasons, the court should reverse. Thank you, counsel. Thank you both. This case is submitted and this court will stand and recess until tomorrow at 2 p.m. in the afternoon. Thank you. Thank you. This court for this session.
judges: Bea, Cardone, Bumatay